884 F.2d 1431
 30 ERC 1273, 280 U.S.App.D.C. 221, 58
USLW 2180,
19 Envtl. L. Rep. 21,424,
35 Cont.Cas.Fed. (CCH) 75,729
 NATIONAL RECYCLING COALITION, INC. and Environmental Defense
Fund, Inc., Petitioners,
v.
William K. REILLY, Administrator, U.S. Environmental
Protection Agency, Respondent,
American Paper Institute, Intervenor.
 No. 88-1511.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 1, 1989.
Decided Sept. 12, 1989.
 
 Karl S. Coplan, New York City, for petitioners. Michael Herz and Clifford P. Case, New York City, were on the brief for petitioners.
 J. Steven Rogers, Atty., U.S. Dept. of Justice, with whom Donald A. Carr, Acting Asst. Atty. Gen., and Richard T. Witt, Atty., Washington, D.C., U.S.E.P.A., were on the brief, for respondent.
 James R. Walpole, Washington, D.C., was on the brief for intervenor. Gregory D. Chafee, Washington, D.C., also entered an appearance for intervenor.
 Before WALD, Chief Judge, and RUTH BADER GINSBURG and BUCKLEY, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 Opinion dissenting in part filed by Chief Judge WALD.
 BUCKLEY, Circuit Judge:
 
 
 1
 At issue is a guideline governing federal purchases of recycled paper products that the Environmental Protection Agency promulgated pursuant to the Resource Conservation and Recovery Act. The Act requires procuring agencies to purchase products containing reclaimed materials but excepts from the purchase obligation certain categories of items, including those found to be "only available at an unreasonable price." Petitioners challenge the guideline's construction of the "unreasonable price" exception to mean that procuring agencies are not required to purchase recycled products if they are more expensive than alternatives made of virgin materials. They also argue that the guideline is deficient because it excludes certain "incidental purchases" from the procurement requirements and fails to fulfill the EPA's statutory obligation to provide information about the availability, performance, and relative price of recycled paper products. We conclude that the EPA's interpretation of the Act is permissible and that the agency has substantially met its statutory obligations.
 
 I. BACKGROUND
 
 2
 Responding to the problem of increasing amounts of hazardous and solid waste in this country, Congress in 1976 passed the Resource Conservation and Recovery Act ("Act"), 42 U.S.C. Secs. 6901-6991 (1982 & Supp. IV 1986). One statutory objective was to encourage the reclamation of such materials. See H.R.Rep. No. 1491, 94th Cong., 2d Sess. 2 (1976), 1976 U.S.Code Cong. & Admin.News, 6238, 6239. To this end, the Act imposes the obligation to buy recycled products on "procuring agencies," which are defined, in section 1004, as
 
 
 3
 any Federal agency, or any State agency or agency of a political subdivision of a State which is using appropriated Federal funds for such procurement, or any person contracting with any such agency with respect to work performed under such contract.
 
 
 4
 42 U.S.C. Sec. 6903(17).
 
 
 5
 Two of the Act's provisions are relevant here. Section 6002(c)(1) provides that
 
 
 6
 each procuring agency which procures any items designated in [EPA] guidelines shall procure such items composed of the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition, considering such guidelines. The decision not to procure such items shall be based on a determination that such procurement items --
 
 
 7
 * * *
 
 
 8
 * * *(C) are only available at an unreasonable price.
 
 
 9
 Id. Sec. 6962(c)(1) (emphases added).
 
 
 10
 Section 6002(e) provides that the Administrator of the Environmental Protection Agency
 
 
 11
 shall prepare, and from time to time revise, guidelines for the use of procuring agencies in complying with the requirements of this section. Such guidelines shall--
 
 
 12
 (1) designate those items which are or can be produced with recovered materials and whose procurement by procuring agencies will carry out the objectives of this section; and
 
 
 13
 (2) set forth recommended practices with respect to the procurement of recovered materials and items containing such materials and with respect to certification by vendors of the percentage of recovered materials used,
 
 
 14
 and shall provide information as to the availability, relative price, and performance of such materials and items and where appropriate shall recommend the level of recovered materials to be contained in the procured product.
 
 
 15
 Id. Sec. 6962(e). Pursuant to this directive, on April 9, 1985, the EPA issued a proposed rule and guideline for purchases of recycled paper and paper products. 50 Fed.Reg. 14,076 (1985). On June 22, 1988, the EPA issued a final rule, 53 Fed.Reg. 23,546 (1988) ("final rule"), in which it promulgated the guideline codified at 40 C.F.R. Part 250 (1988), id. at 23,561 ("guideline").
 
 
 16
 Petitioners challenge the guideline on three grounds. They assert, first, that the EPA's interpretation of "unreasonable price" contravenes the intent of the Act; second, the exclusion from coverage of "unrelated" or "incidental" purchases implies a limitation on the obligation to procure recycled products that finds no support in the statute; and third, its failure to provide price and availability information violates an explicit statutory command.
 
 
 17
 The EPA defends the guideline on the merits and also contends that petitioners lack standing to bring this action or, in the alternative, fail to present a claim that is ripe for judicial disposition. As these arguments implicate our jurisdiction, we must consider them first.
 
 II. DISCUSSION
 A. Justiciability Issues
 1. Standing
 
 18
 The Supreme Court has summarized the constitutional elements of standing in these terms:
 
 
 19
 [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision"....
 
 
 20
 Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted).
 
 
 21
 The EPA argues that petitioners lack standing to challenge its guideline because it merely "recommend[s] practices with respect to the procurement of recovered materials," 42 U.S.C. Sec. 6962(e)(2) (emphasis added), which the procuring agencies are free to accept or disregard; therefore, any injuries alleged by petitioners cannot fairly be traced to the guideline nor be redressed by a decision in their favor. Rather, the injuries (if they occur) will result from the purchasing policies adopted by individual procuring agencies and can only be redressed in actions brought against them. Thus, the EPA asserts, whatever injury petitioners might ultimately suffer will be caused by third parties rather than by its guideline.
 
 
 22
 The EPA's argument ignores the fact that the EPA itself is a substantial purchaser of paper products. As the EPA's counsel acknowledged at oral argument, the agency would feel bound by its own guideline in making its paper product purchases. Petitioners, however, must do more than establish the causal link between the challenged guideline and the injuries they allege. As they bring this action on behalf of their members, petitioners must also satisfy the requirements for representational standing:
 
 
 23
 An association ... will have standing to sue on behalf of its members when they would otherwise have standing in their own right, the interests the organization seeks to protect are germane to its purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the law suit.
 
 
 24
 Hazardous Waste Treatment Council v. EPA, 861 F.2d 270, 273 (D.C.Cir.1988) (citing Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)), cert. denied, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1989).
 
 
 25
 Petitioners are membership organizations dedicated, in the case of the National Recycling Coalition ("NRC"), to encouraging the recovery, reuse, and conservation of materials and energy and, in the case of the Environmental Defense Fund ("EDF"), to the protection of the environment and public health. Thus they satisfy the second and third requirements for representational standing: the interests they seek to protect are clearly germane to their organizational purposes, and the participation of affected members in this action is not required.
 
 
 26
 Furthermore, the NRC includes corporations engaged in commercial recycling who would clearly have standing to bring this action in their own right because of the potential impact of the guideline on the market for their products and because any economic injury they might suffer would be redressed by a favorable outcome. Thus, the NRC has representational standing. Having so found, we need not inquire into the standing of its copetitioner. Hazardous Waste Treatment Council, 861 F.2d at 273.
 
 2. Ripeness
 
 27
 The EPA also argues that even if petitioners do have standing, we should refrain from hearing this case because their claims are not yet ripe. The Supreme Court has established a two-part test for ripeness that requires us to evaluate "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." Abbott Laboratories v. Gardner, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967). In Eagle-Picher Industries, Inc. v. EPA, 759 F.2d 905, 918 (D.C.Cir.1985), however, we stated that "[w]here the first prong of the [Abbott Laboratories ] ripeness test is met and Congress has emphatically declared a preference for immediate review ... no purpose is served by proceeding to the second prong."
 
 
 28
 In our view, the guideline satisfies the Eagle-Picher test. The guideline represents final agency action; and as it will affect the EPA's own procurement decisions, it is irrelevant that other procuring agencies have not yet adopted them. Furthermore, Congress has "declared a preference" for prompt judicial review of the EPA guideline:
 
 
 29
 [A] petition for review of action of the [EPA] Administrator in promulgating any regulation, or requirement under this chapter ... shall be filed within ninety days from the date of such promulgation....
 
 
 30
 42 U.S.C. Sec. 6976(a)(1). As the provision requiring the EPA to issue the guideline falls within the same chapter as section 6976(a)(1), we conclude that judicial review at this time is not merely "preferred," it is statutorily required. We therefore turn to the merits.
 
 
 31
 B. "Unreasonable Price"
 
 
 32
 The Act provides that a procuring agency is not required to purchase products containing reclaimed materials if it determines that such items "are only available at an unreasonable price." 42 U.S.C. Sec. 6962(c)(1)(C). In its final rule, the EPA noted that while certain commentators had stated that a "reasonable price" included price preferences, the Act did not explicitly authorize it to recommend payment of such a preference. The agency concluded thatunless an agency has an independent authority to provide a price preference or to create a set-aside, EPA believes that a price is "unreasonable" if it is greater than the price of a competing product made of virgin material.
 
 
 33
 53 Fed.Reg. 23,559. Thus, in the EPA's view, while the Act creates a preference in favor of recycled goods in "tie-breaking" situations where products made of reclaimed and virgin materials are offered at the same price, it does not require agencies to pay a premium in order to purchase them.
 
 
 34
 Because Congress has entrusted the EPA to administer the Act, our review will be guided by the two-prong test established by Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842-45, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984), and its progeny. First, if Congress has clearly expressed its intent on the precise question involved, a reviewing court will enforce it. Id. at 842-43, 104 S.Ct. 2781-82. In ascertaining a statute's plain meaning, we "must look to the particular statutory language at issue, as well as the language and design of the statute as a whole." K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 108 S.Ct. 1811, 1817, 100 L.Ed.2d 313 (1988). Second,
 
 
 35
 [i]f the statute is silent or ambiguous with respect to the specific issue addressed by the regulation, the question becomes whether the agency regulation is a permissible construction of the statute. If the agency regulation is not in conflict with the plain language of the statute, a reviewing court must give deference to the agency's interpretation of the statute.
 
 
 36
 Id. (citations omitted). In this case, if we find the Act to be silent or unclear as to the precise meaning to be given section 6002, we must defer to the EPA's interpretation as "permissible" if it does not contravene the statute's plain meaning.
 
 
 37
 In making this determination, we first focus on the language of section 6002(c)(1)(C), which relieves a procuring agency of the obligation to purchase recycled items if it determines that they "are only available at an unreasonable price." As the word "unreasonable" is inherently subjective, the language of section 6002(c)(1)(C) provides little guidance as to Congress' specific intent.
 
 
 38
 Petitioners nevertheless challenge the EPA's interpretation as contrary to the plain meaning of the Act. They maintain that a "reasonable price" means one that is "not excessive or extreme; fair; moderate," citing a dictionary definition to support their position that a reasonable price need not be the lowest price. Petitioners then argue that if the ordinary meaning of this language is read in light of the Act's purpose of encouraging recycling, section 6002(c)(1) must be construed to permit the purchase of the statutorily preferred recycled products at prices higher than the lowest at which goods made from virgin materials are offered.
 
 
 39
 To bolster their contention that the EPA's interpretation will frustrate the Act's aim, petitioners argue that the tie-breaker preference provided by the EPA's construction deprives the Act of any real value as a means of promoting the purchase of recycled materials because tie bids for paper products are very rare. Petitioners further contend that the guideline renders section 6002(c)(1)(C) meaningless because in all but the rare tie-breaking case, procuring agencies would only be required to buy recycled products when offered at the lowest bid, which is the normal requirement under the rules governing federal purchases.
 
 
 40
 We reject this argument. Petitioners contend that the statutory objective of encouraging recycling can only be fulfilled if agencies are permitted to pay something over the minimum bid for products made of virgin materials. This reasoning, however, rests on the unsupported assumption that price was the critical obstacle to the marketing of recycled products prior to the Act's passage. If this were true, the inference that Congress contemplated the preferential prices might be compelling. Counsel for petitioners and the EPA agreed at oral argument, however, that nothing in the record suggests that paper products containing reclaimed materials are more expensive than those made from virgin fibers. Accord H.R.Rep. No. 198, 98th Cong., 2d Sess. 71, reprinted in 1984 U.S.Code Cong. & Admin.News 5576, 5630 (citing Maryland's report that " 'recycled paper has generally been less expensive than virgin paper.' ").
 
 
 41
 While there is no evidence that Congress viewed price as the inhibiting factor in the use of reclaimed materials, the Act's provisions suggest that Congress relied on factors other than price to achieve its policy goals. Section 6002 requires the EPA to identify acceptable recycled alternatives to products made of virgin materials and to develop specifications for their purchase, and it establishes a major market for such goods by mobilizing the purchasing power of the federal government. These requirements are entirely compatible with a strategy that depends on a heightened awareness of the need to utilize recycled materials, the dissemination of information through the EPA guidelines, and on an assured market to encourage the development, production, and sale of recycled goods at competitive prices.
 
 
 42
 Petitioners also assert that the structure of section 6002 compels the conclusion that Congress contemplated the payment of preferential prices for products containing recovered materials because section 6002(i) establishes "an affirmative procurement program that will assure that items composed of recovered materials will be purchased to the maximum extent practicable." 42 U.S.C. Sec. 6962(i)(1) (emphases added). This program, which each procuring agency is required to put into effect, must include "a recovered materials preference program." Id. Sec. 6002(i)(2)(A) (emphasis added). Petitioners reason that such a program would be meaningless if a preference based on the content of recycled materials came into play only as a tie-breaker. Thus, they conclude that the phrase "unreasonable price" must be interpreted to permit some degree of preferential pricing.
 
 
 43
 This structural argument has little merit. Section 6002(i) was added to the Act by amendment in 1984. Therefore, its adoption tells us nothing about Congress' intent when it enacted the "unreasonable price" provision eight years earlier. And even if the affirmative procurement amendment had been offered contemporaneously and been accepted as part of the bill as enacted, its adoption would not have carried the necessary implication that Congress contemplated the payment of preferential prices for recycled goods. In fact, statements made by two of the amendment's Senate sponsors tug in the opposite direction:
 
 
 44
 MR. MATHIAS. This amendment does not change existing [Joint Committee on Printing] specifications nor the requirement that low price prevail before a paper products contract is awarded.
 
 
 45
 MR. KASTEN. The Senator from Maryland [Mr. Mathias] is correct. Under my amendment, all paper products purchased by the federal government must continue to meet JCP specifications, and, most importantly, lowest price continues to be the determining factor in awarding these contracts....
 
 
 46
 MR. MATHIAS. Are we to understand, for example, that if GSA establishes a 25-percent-minimum-content standard for "post consumer waste product" and one supplier can meet that requirement at a cost of $20 per given amount and another supplier can offer the same amount of virgin paper for $15, then GSA is obligated to buy the virgin paper?
 
 
 47
 MR. KASTEN. The Senator is correct. This amendment only adds a third criterion to Federal paper product purchases. All other things being equal, this amendment states that recycled paper will be purchased by the Federal Government. The purpose of this amendment is to send a message that the Federal Government supports and encourages efforts to recycle paper.
 
 
 48
 130 Cong.Rec. 20,855 (1984).
 
 
 49
 We cite this exchange not because it reflects an authoritative interpretation of the "unreasonable price" provision (it does not), but because it rebuts the inference petitioners would have us draw from Congress' adoption of section 6002(i). Clearly, Senators Kasten and Mathias would not have seen an inconsistency between the affirmative procurement programs mandated by their amendment and the EPA's understanding of what constitutes an "unreasonable price."
 
 
 50
 While we acknowledge that petitioners' interpretation of section 6002 is entirely plausible, our examination of the text of section 6002(c)(1)(C) and the language and design of the Act fails to reveal what Congress intended the phrase "unreasonable price" to mean. Consequently, we must move to Chevron 's second prong to determine whether the EPA's construction of that provision is "permissible." If we conclude it does not conflict with the statute's plain meaning, we are required to defer to it. See K Mart, 108 S.Ct. at 1817. For the reasons discussed above, we find the EPA's interpretation of "unreasonable price" to be consistent with the Act's overall purpose. Therefore, we accede to the agency's construction.
 
 
 51
 C. "Incidental Purchases"
 
 By its terms, the guideline does not cover
 
 52
 [p]urchases of paper and paper products that are unrelated or incidental to Federal funding, i.e., not the direct result of a Federal contract, grant, loan, funds disbursement, or agreement with a procuring agency....
 
 
 53
 53 Fed.Reg. 23,562 (codified at 40 C.F.R. Sec. 250.3(e) (1988)). The preamble to the final rule provides the following illustration of the scope of the exclusion:
 
 
 54
 An example of a paper purchase unrelated to or incidental to Federal funding is where a contractor purchases paper under a grant for construction of a public works project. The paper purchase would not be subject to the requirements of Section 6002 or this guideline, even though some of the grant funds supporting the contract might be used to finance the purchases.
 
 
 55
 Id. at 23,550.
 
 
 56
 Petitioners maintain that the EPA's distinction between incidental and non-incidental purchases has no statutory basis. They point out that section 6002(e) requires the agency to prepare guidelines "for the use of procuring agencies," 42 U.S.C. Sec. 6962(e), which are defined to include "any person contracting with such agency with respect to work performed under such contract." Id. at 6903(17) (emphasis added).
 
 
 57
 The EPA counters that petitioners are precluded from pursuing this challenge on appeal because they failed to raise it during the rulemaking process. Petitioners concede this failure but assert that they never had a fair opportunity to raise this objection during the notice and hearing period because they did not realize that the exclusion would extend to public work contractors until the EPA provided an example of the exclusion's scope in its final rule. Petitioners also argue that we may appropriately consider its claim because the doctrine requiring exhaustion of administrative remedies is at its weakest when the issue raised for the first time on appeal is a pure question of statutory interpretation (citing Railroad Yardmasters v. Harris, 721 F.2d 1332 (D.C.Cir.1983)).
 
 
 58
 We demur on two grounds. First, as the guideline proposed by the EPA in 1985 contained the precise language codified at 40 C.F.R. Sec. 250.3 (1988), see 50 Fed.Reg. 14,082 (1985), petitioners had adequate notice of the nature and scope of the exclusion even though they did not have the benefit of the example included in the final rule. Second, Railroad Yardmasters permitted the question of statutory interpretation to be raised on appeal because it implicated the agency's authority to act. Id. at 1338-39. As the EPA's power to issue the disputed guideline is not challenged, we decline to make an exception to the general rule that a reviewing court will not consider an objection that petitioners failed to raise during the administrative process. Northside Sanitary Landfill, Inc. v. Thomas, 849 F.2d 1516, 1519 (D.C.Cir.1988), cert. denied, --- U.S. ----, 109 S.Ct. 1528, 103 L.Ed.2d 833 (1989); Eagle-Picher Industries, Inc. v. EPA, 822 F.2d 132, 146 (D.C.Cir.1987).
 
 D. EPA Provision of Relevant Information
 
 59
 Petitioners' final assertion is that the EPA's guideline fails to comply with section 6002(e) of the Act, which provides:The Administrator ... shall prepare, and from time to time revise, guidelines for the use of procuring agencies in complying with the requirements of this section. Such guidelines ... shall provide information as to the availability, relative price, and performance of such materials and items....
 
 
 60
 42 U.S.C. Sec. 6962(e).
 
 
 61
 As the agency provided an adequate discussion of the performance of recycled products in the final rule's preamble, see 53 Fed.Reg. 23,548-49, we turn to the EPA's acknowledged failure to publish the balance of the information required by section 6002(e). In explaining its omission, the EPA claimed that the availability and price of recycled paper and paper products were subject to such sharp and frequent fluctuations that specific information about them "would not remain accurate long enough ... to be useful in a guideline." Id. at 23,559. At oral argument, however, EPA's counsel stated that the agency maintains a docket with updated data on relative prices and availability that is accessible to the public.
 
 
 62
 Given the practical difficulties detailed by the agency, we conclude that although the EPA is in technical non-compliance with the statute, it may cure that deficiency by inserting in its guideline a reference to where and how interested parties may secure such data. Accordingly, we decline to invalidate the regulation on the understanding that the agency will promptly amend the guideline to provide the requisite information.
 
 III. CONCLUSION
 
 63
 For the foregoing reasons, we reject petitioners' arguments and, therefore, deny the petition for review.
 
 
 64
 So ordered.
 
 WALD, Chief Judge, dissenting in part:
 
 65
 In determining whether a case falls within the first or second prong of Chevron, the crucial first step is specifying the precise question at issue. Chevron U.S.A. Inc. v. NRDC, Inc., 467 U.S. 837, 842, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984); Ohio v. United States Department of the Interior, 880 F.2d 432, 442 (D.C.Cir.1989). The majority opinion frames the question this case presents as, "what Congress intended the phrase 'unreasonable price' to mean." Majority opinion (Maj. op.) at 1437. Although that question is certainly involved, the case really turns on the narrower question of whether Congress intended to authorize the Environmental Protection Agency (the EPA or the Agency) to recommend that federal procurement agencies, in designing programs to increase their purchases of recycled goods, pursue a strategy that involves never paying any premium over the lowest bid price for such items. Because I believe that Congress did not give the EPA that authority, I respectfully dissent from Part II.B of the majority's opinion.[1] Furthermore, even if Congress did not compel the EPA to recommend that procurement agencies be allowed to give some price preference to recycled goods, I believe that the agency's mistaken conclusion that Congress forbade it to do so is itself a sufficient basis on which to overturn the challenged rule.
 
 I.
 
 66
 Congress passed the Resource Conservation and Recovery Act (RCRA or the Act), 42 U.S.C. Secs. 6901-6991 (1982 & Supp. IV 1986), to address the serious waste management problems facing this nation. See 42 U.S.C. Sec. 6901. One goal of the Act was to encourage recovery, rather than disposal, of discarded materials. See Sec. 6902. Congress decided to use the power of federal procurement dollars as a means to further this goal: it directed that federal procuring agencies procure items with the "highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition," although not when such items "are only available at an unreasonable price." See Sec. 6962(c).
 
 
 67
 How did Congress envision that the RCRA would lead to an increase in federal purchasing of recycled goods? There are two possible answers. One is that Congress thought the increased purchase of such goods to be a worthy social objective, for which the United States ought to be willing to pay something. Congress, according to this view, therefore created an exception to the usual rules that require federal procurement agencies to purchase goods at the lowest bid price, and authorized such agencies to pay some extra amount for goods made of recovered materials. Under this regime, the role of the EPA would be to create guidelines that would help procurement agencies determine how much more they ought to be willing to pay for such goods.
 
 
 68
 The other possibility is that, although Congress wanted to increase federal purchasing of goods made of recovered materials, it did not want federal procurement agencies ever to pay anything extra for such goods. The increased purchasing of such goods would instead be achieved in two ways: first, by using recovered materials content as a tiebreaker when bids are exactly equal in price, and, second, by an "awareness" program: statutory provisions that would overcome the disdain some procurement agencies apparently felt for recycled goods, create among procurement agencies an increased awareness of the importance of purchasing recycled goods, and encourage contractors to submit bids based on recycled goods. Thus, by enlarging the amount of recycled goods in the bidding pool, the program could increase the amount of recycled goods purchased by federal agencies without requiring any increased cost.
 
 
 69
 The error of the majority opinion lies in its conclusion that because the Act uses an imprecise term--"unreasonable"--to describe the limits on the price that a federal procurement agency can pay for recycled goods, it does not instruct us as to which of the two strategies just described Congress meant to adopt. But in fact, the language and structure of the Act strongly suggest that, although Congress certainly desired to pursue the "awareness" strategy, it also intended to authorize federal agencies to pay some extra amount for the purchase of recycled goods. The EPA's role in the statutory scheme is to aid agencies in determining what this extra amount should be; it does not have the authority to make the policy decision, already made by Congress, as to which strategy should be used to increase federal purchases of recycled goods.
 
 A. The Language and Structure of Sec. 6962
 
 70
 The RCRA directs the Administrator of the EPA to prepare guidelines designating those items which are or can be produced with recovered materials. See Sec. 6962(e). The Act then directs that all federal procuring agencies that procure any item designated in such guidelines
 
 
 71
 shall procure such items composed of the highest percentage of recovered materials practicable ..., consistent with maintaining a satisfactory level of competition, considering such guidelines. The decision not to procure such items shall be based on a determination that such procurement items--
 
 
 72
 ....
 
 
 73
 (C) are only available at an unreasonable price.
 
 
 74
 Section 6962(c)(1).
 
 
 75
 If Congress wished to restrict federal purchases of recycled goods to those cases in which such goods prove to be cheapest (or at least, tied for cheapest) in a competitive bidding process that also includes virgin goods, it chose awkward language for its purpose. The natural implication of Congress' use of the word "unreasonable" in Sec. 6962(c)(1)(C) is that the EPA should apply its reasoned discretion in deciding whether to recommend purchase of an item made from recovered materials in cases where the same item could be had more cheaply if made from virgin materials. The EPA should balance the advantages of purchasing recycled goods against their added cost. If Congress wished federal agencies to adhere strictly to the practice of always purchasing the cheapest item meeting a given specification, and to give items made from recovered materials a preference only in the case of exactly equal bids, the statute could easily have made this clear.[2]
 
 
 76
 The structure of the Act also suggests that Congress intended to pursue more than just an "awareness" strategy to increase federal purchasing of items made from recovered materials. Section 6962(e), for instance, requires the EPA, where appropriate, to recommend the level of recovered material to be contained in procured products. Such recommendations would be pointless if procuring agencies were required to purchase the cheapest product available regardless of its recovered materials content. Section 6962(i), added to the statute in 1984, requires all procuring agencies to develop an "affirmative procurement program," which must contain, among other things, a "recovered materials preference program," and an "agency promotion program" to promote the preference program. This would be absurdly elaborate if the "preference" were in fact limited to the use of recovered materials content as a tiebreaker between otherwise equal bids.
 
 
 77
 Section 6962(i) goes on to specify more precisely two possible procurement programs that Congress envisioned. The first is "Case by Case Policy Development":
 
 
 78
 Subject to the limitations of subsection (c)(1)(A) through (C) of this section [which include the "unreasonable price" limitation], a policy of awarding contracts to the vendor offering an item composed of the highest percentage of recovered materials practicable.... Subject to such limitations, agencies may make an award to a vendor offering items with less than the maximum recovered materials content.
 
 
 79
 Section 6962(i)(3)(A).
 
 
 80
 A policy of awarding contracts to the vendor offering an item composed of the highest percentage of recovered materials practicable, unless it is available only at an unreasonable price, fits well with the concept that the procuring agency (with the EPA's guidance) should balance the advantages of high recovered materials content against the disadvantages of increased cost. Such a policy would, however, make no difference in agency purchasing if the agency were always bound to buy the cheapest product meeting its specification. Moreover, the second sentence, which specifically gives the procuring agency the discretion to purchase an item with less than the maximum recovered materials content, is pointless if the agency is in fact bound to buy the cheapest item. Only in the rare case of exactly equal bid prices would either of these sentences have any effect at all.
 
 
 81
 In its own regulation, the EPA admitted that, under its guidelines, an agency could probably not use the "case-by-case" method to increase its purchases of recycled goods. See 53 Fed.Reg. 23,546, 23,553 (1988). Presumably, Congress included this method as a statutory possibility because it believed that the method could work. The fact that the EPA's regulation makes a statutory option impossible to implement strongly suggests that the regulation itself is inconsistent with the statute.
 
 
 82
 The other statutorily approved program is that of "Minimum Content Standards":
 
 
 83
 Minimum recovered materials content specifications which are set in such a way as to assure that the recovered materials content ... required is the maximum available without jeopardizing the intended end use of the item, or violating the limitations of subsection (c)(1)(A) through (C) of this section.
 
 
 84
 Section 6962(i)(3)(B). It is this program that the EPA recommends in its regulation. 53 Fed.Reg. at 23,553. The EPA thus believes that procuring agencies can increase their purchases of recycled goods by simply requiring a certain recovered materials content in their specifications. However, inasmuch as this statutory program, like the case-by-case program, is limited by Sec. 6962(c)(1)(C), and inasmuch as the EPA considers that section to limit the permissible purchase price to the lowest obtainable competitive price, the EPA's recommendation makes no sense whatsoever: it totally fails to explain how a procuring agency can set a minimum content standard and still insure that it will not result in any increase in purchase price. The EPA claims to solve this puzzle by saying that Sec. 6962(i)(3)(B) provides express statutory authorization for procuring agencies to set such standards, provided they result in no projected or observed long-term or average increase in purchase prices. 53 Fed.Reg. at 23,554, 23,559.
 
 
 85
 This is a curious claim for the EPA to make. The EPA's conclusion that Sec. 6962(c)(1)(C) generally forbids the payment of any price preference is based largely on the exchange between Senators Mathias and Kasten quoted in the majority opinion. See Br. for Respondent at 31-34. That exchange, if taken as definitive, makes clear that even in the case of a single contract, in which the procuring agency's specification includes a minimum recovered materials content, the agency is bound to purchase the cheapest item offered, whether it meets the content requirement or not. If, despite the Mathias-Kasten exchange, Sec. 6962(i)(3)(B) is to be read as providing express authorization for a minimum content standards program that sometimes allows agencies to purchase items that could be made more cheaply with virgin materials, it is hard to see why it does not also expressly authorize a reasonable long-term price increase, and why Sec. 6962(i)(3)(A) does not expressly authorize a case-by-case program that allows the payment of a reasonable price premium for items made of recovered materials.
 
 
 86
 Furthermore, under the EPA's interpretation, a minimum content standards program is unlikely to cause an increase in federal purchasing of items made from recovered materials. After the first year of purchasing under such a program, the procuring agency either will or will not observe an average price increase for the procured items. According to the EPA, if such a price increase, no matter how small, is observed, the minimum content standard must be dropped. If it is not observed, then the item made from recovered materials must be cheaper (except in the rare case of exactly equal average prices), and so the procuring agency should purchase it even in the absence of a minimum content standard program.
 
 
 87
 If the language and structure of Sec. 6962 make only one thing clear, it is that Congress wished to increase federal purchases of items made from recovered materials. The EPA's interpretation of Sec. 6962(c)(1)(C) renders nugatory one of the statutorily recommended programs for doing so, deprives the other of most of its force, and drains several parts of Sec. 6962 of all meaning. Such an interpretation can be, and is, in fact, based only on the EPA's selective look at the legislative history of the section, to which I now turn.
 
 B. Legislative History
 
 88
 In both the preamble to its regulation and its brief before this court, the EPA bases its interpretation of Sec. 6962(c)(1)(C) on portions of the legislative history of the RCRA, and in particular, on the Mathias-Kasten exchange quoted by the majority. While there is no question that some portions of the legislative history support the EPA's interpretation, I believe that the legislative history considered as a whole does not offer the agency the support it needs to overcome the language and structure of the statute.
 
 
 89
 Section 6962 began with a very simple idea. When Senator Randolph introduced the RCRA onto the Senate floor in 1975, he said:
 
 
 90
 If we are to be successful in stimulating the recovery and reuse of waste resources, the Federal Government must set an example. Our proposed legislation requires the Federal Government in its procurement practices to give preference to materials and energy made with recovered resources.
 
 
 91
 121 Cong.Rec. 23,850 (1975) (emphasis added). The critical issue before us is what sort of preference Congress decided such materials should receive.
 
 
 92
 The Mathias-Kasten exchange relied upon by the majority certainly suggests that the only preference intended is a minimal, tie-breaking preference. However, it should be noted that Senator Kasten, on the same day, also described the preference by saying, "Most simply stated this means that of substantially equal low bids meeting product specification the paper which contains the highest percentage of recycled materials would be selected." 130 Cong.Rec. 20,855 (1984). This suggests that at least some small price preference should be allowed.
 
 
 93
 Meanwhile, on the House floor, Representatives Wyden and Hawkins engaged in a colloquy which shows that, in at least some situations, a price preference was intended:
 
 
 94
 Mr. WYDEN....
 
 
 95
 Under the case-by-case policy development option, unreasonable cost to the Government is indeed a controlling factor. As far as ... procurement of printing paper is concerned, the recycled fiber content ... would in essence be the tie-breaking criterion for two equally priced low bids.
 
 
 96
 Under the minimum content standards option, however, a procuring agency can specify a minimum recovered materials content percentage which all acceptable bids must comply with.... With respect to paper, the GPO could, for instance, require any acceptable bid to contain no less than 30 percent post-consumer waste fiber content and then select the lowest cost bid among all qualifying bids.
 
 
 97
 ....
 
 
 98
 Mr. HAWKINS. Your explanation is clear, however, it does indicate that instances may occur when the Government could be paying more money for paper in order to encourage the use of recovered materials.
 
 
 99
 130 Cong.Rec. H9160-61 (daily ed. Nov. 3, 1983). Unlike the Mathias-Kasten exchange, this exchange clearly shows that some members of Congress contemplated that the Act, through the authorization of minimum content standards programs, provided for the payment of a price premium for items made of recovered materials.
 
 
 100
 The EPA nonetheless claims that Congress thought its goal of increasing federal purchases of such items could be achieved at no cost to the taxpayer. Br. for Respondent at 34. To make sense of the EPA's interpretation, we must assume that Congress thought recycled goods would always be less expensive (or at least no more expensive) than comparable virgin goods, and that only a lack of initiative on the part of federal procuring agencies was preventing them from purchasing recycled goods. Indeed, the EPA suggests that this is precisely what Congress had in mind, and the majority accepts the suggestion. Maj. op. at 1435-36. In support of this view, the majority cites the House report accompanying the 1984 amendments to Sec. 6962, which shows that the relevant congressional committee was aware that the state of Maryland had generally found recycled paper to be less expensive than virgin paper. Maj. op. at 1436.
 
 
 101
 The problem, however, is that the RCRA is not concerned solely with paper. The EPA and the majority make an unjustified leap from the asserted cheapness of recycled paper to the conclusion that Congress thought price was not an obstacle to the marketing of any recycled product. But the very next paragraph of the House report, for example, discusses a paving material made from recycled shredded tires, and notes that the Surface Transportation Assistance Act allows states to receive a five percent increase in the Federal-aid share for highway projects using substantial amounts of recycled rubber or other recycled materials. H.R.Rep. No. 198, 98th Cong., 2d Sess. 71, reprinted in 1984 U.S.Code Cong. & Admin.News 5576, 5630. This certainly suggests that in some circumstances Congress was willing to have the federal government pay extra money to support the purchase of recycled materials.
 
 
 102
 The legislative history does contain some other material that bears on the question of whether Congress might have thought that increased purchasing of recycled materials could always be achieved at no extra cost. In the 1976 House hearings on the adoption of the RCRA, Jack M. Eckerd, the administrator of the General Services Administration (GSA), testified that the GSA already had a program to identify and procure recycled goods. The GSA had "developed 14 purchase specifications with requirements for goods containing from 3- to 40-percent recycled materials." This program, Mr. Eckerd said, was being carried forward at no additional cost to taxpayers; indeed, sometimes, it produced a savings. Resource Conservation and Recovery Act of 1976: Hearings on H.R. 14496 Before the Subcomm. on Transportation and Commerce of the House Comm. on Interstate and Foreign Commerce, 94th Cong., 2d Sess. 119 (1976) [hereinafter 1976 House Hearings ].
 
 
 103
 This statement certainly indicates that Congress had before it some evidence that several different kinds of recycled products could be purchased more cheaply than virgin products. But in the questioning that followed Mr. Eckerd's prepared statement, the GSA purchasing program was elucidated more fully. Joseph Hantman, the director of procurement for the paper products division, was asked what happened if the GSA put out a specification requiring paper to have a certain recovered materials content, and a bid was submitted that did not meet the content requirement but was cheaper than any bid that did. Mr. Hantman replied:
 
 
 104
 When we put our bids out we prescribe in that bid the percentage of reclaimed fiber which is required. If the bidder submits an offer that does not meet the percentage that we require, under the procurement law we cannot make an award to him. It is called a nonresponsive bid and we cannot consider it.
 
 
 105
 But we do analyze our prices very carefully. If under the same procurement the prices that we did receive which did offer the reclaimed percentage that was required are in our knowledgeable opinion excessive prices, we will reject the bid in its entirety. There is nothing that makes it obligatory on us to award a contract at prices that we deem excessive.
 
 
 106
 In such situations we would reissue the bid under a different set of ground rules so we could consider the offer without reclaimed fiber at a much more favorable price.
 
 
 107
 1976 House Hearings, at 157.
 
 
 108
 This reply suggests that there was some flexibility in the GSA program that allowed the government to purchase recycled paper even if virgin paper could be had more cheaply. This would be achieved by having the specification require a certain percentage of reclaimed fiber. Of course, the GSA would not purchase paper meeting such specifications if doing so would result in a large increase in government cost; instead, it would withdraw the bid entirely and create a new specification allowing it to purchase virgin paper. But this happened only when the price of the recycled paper was "excessive," and "excessive" does not seem here to have the meaning of "any price in excess of the price of virgin paper," for if a bid for virgin paper had been submitted, it would hardly require the "knowledgeable opinion" of GSA officials simply to determine which bid was higher. It seems that the specification would be withdrawn entirely only if by doing so the GSA could achieve a "much more favorable price."
 
 
 109
 This seems to be precisely what Congress had in mind when it adopted Sec. 6962(i). The House Conference Report accompanying the 1984 amendments said that "[i]t is the intent of this provision to grant both the affected procuring agencies and the EPA flexibility in structuring guidelines and in structuring an affirmative procurement program in compliance with this Act." H.R.Rep. No. 1133, 98th Cong., 2d Sess. 122, reprinted in 1984 U.S.Code Cong. & Admin.News 5649, 5693 (emphasis added). I agree with the EPA that an agency that adopts a minimum content standard program should monitor its long-term costs. The agency should withdraw the standard if the added cost necessary to maintain it is unreasonable; that is the import of Sec. 6962(c)(1)(C). But there can be no "flexibility" if the procuring agency is obliged to withdraw a minimum content standard that leads to any increased cost.[3]
 
 
 110
 I have no doubt that Congress would be delighted to hear of cases in which federal procuring agencies actually save money by purchasing recycled products. Indeed, if the EPA, in determining how much extra money procuring agencies should be willing to pay for a recycled product, had concluded that in the particular case of paper products this amount should be zero, because a properly made recycled paper product is cheaper than a virgin one, that would be precisely the sort of exercise of agency discretion to which this court must defer. I do not suggest that the statute compels the EPA to recommend that federal agencies always pay a price preference for all recycled products. But the statute does require that the EPA consider, with respect to each product for which it issues a guideline, how much of a price preference, if any, is reasonable. The EPA may not simply determine that a price preference is never appropriate, and then conclude as a corollary that there should be no price preference for paper products. See 53 Fed.Reg. at 23,553, 23,559.
 
 
 111
 Like the majority, I do not wish to place too much stress on these legislative materials, some of which, after all, are only statements made in committee hearings. I cite them to show that this is not a case where ambiguous statutory language and structure must be made clear by helpful legislative history, but rather a case in which the statutory language and structure are relatively clear, and the legislative history ambiguous. Taken together, they suggest that the EPA had no authority to lay down a rigid stricture that federal procuring agencies never pay any price premium for items made from recovered materials.
 
 
 112
 This is a Chevron I case. Congress has spoken to the precise question at issue, and we should enforce Congress' intent. The EPA's duty under the statute is not to decide whether federal procuring agencies should ever pay a price premium for items made of recycled materials, but rather to decide how much of a premium, if any, is reasonable for specific items.
 
 II.
 
 113
 Even if the RCRA is interpreted not to compel the EPA to permit a price preference strategy in the purchase of recycled goods, we should overturn the rule challenged here for another reason. The EPA, in adopting its rule, acted under the mistaken assumption that it could not recommend a price preference. The resulting rule, therefore, does not represent an exercise of the EPA's discretion, but rather its mistaken view of the law. This court must overturn the rule, under the doctrine of SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943), even if the EPA could have adopted it by exercising its discretion.
 
 
 114
 In the preamble to its proposed rule on April 9, 1985, the EPA indicated its belief that it lacked authority to recommend any price preference for recycled goods:
 
 
 115
 In the case of Federal preferential procurement programs that allow a price preference or a set-aside, the Agency found that each had been established under explicit statutory authority or a specific Executive Order. Neither the statutory language nor the legislative history of Section 6002 [codified at 42 U.S.C. Sec. 6962] seems, however, to contemplate the adoption of either price preferences or set-asides. In fact, the legislative history of the 1984 Amendments appears to indicate that price preferences and set-asides would be unacceptable.
 
 
 116
 50 Fed.Reg. 14,076, 14,079 (1985). The preamble to the revised final rule shows that the EPA adhered to this belief when making the rule:
 
 
 117
 Neither the statutory language nor the legislative history of Section 6002 seems to contemplate the adoption of either price preferences or set-asides, and doing so would conflict with existing Federal procurement regulations....
 
 
 118
 RCRA Section 6002 does not provide explicit authority to EPA to authorize or recommend payment of a price preference or to create a set-aside. Therefore, unless an agency has an independent authority to provide a price preference or to create a set-aside, EPA believes that a price is "unreasonable" if it is greater than the price of a competing product made of virgin material.
 
 
 119
 53 Fed.Reg. at 23,553, 23,559.
 
 
 120
 An administrative agency is entitled to deference when it exercises discretion delegated to it by statute. However, deference is not appropriate when agency action "is based not on the agency's own judgment but on an erroneous view of the law," Prill v. NLRB, 755 F.2d 941, 947 (D.C.Cir.), cert. denied, 474 U.S. 948, 106 S.Ct. 313, 88 L.Ed.2d 294 (1985), for "an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained." SEC v. Chenery Corp., 318 U.S. at 95, 63 S.Ct. at 462. In particular, we have held that "[w]hen [an agency] bases a decision on a standard it unjustifiably believes was mandated by Congress, [its] decision must not be enforced, even though [it] might be able to adopt the very same standard in the exercise of its discretion." International Brotherhood of Electrical Workers, Local Union No. 474 v. NLRB (St. Francis Hospital), 814 F.2d 697, 708 (D.C.Cir.1987) (emphasis added).
 
 
 121
 In this case, the EPA has acted under the belief that it lacked authority to recommend any price preference in the purchase of recycled goods. Therefore, in order to uphold the Agency's order, we must find not only that it would have been reasonable for it to decide, in its discretion, never to recommend any price preference, but also that it was reasonable for it to decide that Congress forbade it to recommend a price preference. My discussion of the text, structure, and history of the statute demonstrates that this is simply not so. I note that even the majority finds "petitioners' interpretation of section 6002 ... entirely plausible." Maj. op. at 1437. Accordingly, even if the EPA has the authority to decide never to recommend a price preference, we should overturn the challenged rule, because it never exercised that authority, and remand the matter to the EPA for a proper exercise of its discretion.
 
 
 122
 The wisdom of the Chenery rule requiring this disposition is demonstrated by the circumstances of the present case. Since the enactment of the RCRA in 1976, the actions of the EPA show an evolution in the agency's desire to recommend a program with some potential for actually increasing federal purchases of recycled goods. For many years, the EPA simply refused to issue the guidelines required by the Act. See Hazardous Waste Control and Enforcement Act of 1983: Hearings before the Subcomm. on Commerce, Transportation, and Tourism of the House Comm. on Energy and Commerce, 98th Cong., 1st Sess. 379-81 (1983). In 1985, when the agency did propose the rule challenged here, it recommended a "case-by-case" policy, under which procuring agencies would take an item's recovered materials content into consideration only in the case of tie bids. Only if the procuring agency observed that an item made from recovered materials was consistently being offered at a competitive price did the EPA recommend that the procuring agency adopt a minimum content standard. See 50 Fed.Reg. at 14,079. In the 1988 revised final rule, however, the EPA admitted that such a policy would accomplish little, and recommended instead a minimum content policy that it believed would allow at least some increase in the purchase of recycled goods. Although hamstrung by its interpretation of Sec. 6962(c)(1)(C), the agency did come up with the notion of allowing minimum content standards to be adopted immediately, so long as they did not lead to projected or observed increases in long-term or average prices. 53 Fed.Reg. at 23,559.
 
 
 123
 We have no way of knowing what the EPA would do if freed of its misconception that it lacks authority to recommend a price preference for recycled goods.[4] As noted above, it is possible that the EPA, in the particular case of paper products, will determine that no price preference should be paid. But we should certainly not let stand a rule based on the agency's mistaken view of the scope of its authority.
 
 III.
 
 124
 The waste management problem that faced the country in 1976 has only gotten worse in the intervening years.[5] Over a decade of foot-dragging by the EPA has prevented the implementation of Congress' desire to use federal procurement monies as a spur to increased recovery of discarded materials. Today's decision essentially leaves federal procurement policies where they were before the passage of the RCRA, except for the rare case where recovered materials content can serve as a tiebreaker between two otherwise equal bids. I do not believe that Congress intended the Act to have such a negligible impact. I respectfully dissent.
 
 
 
 [1]
 I concur in those portions of the majority opinion that concern standing and ripeness, the "incidental purchases" provision of the regulation, and the EPA's failure to provide the information required by 42 U.S.C. Sec. 6962(e)
 
 
 [2]
 For instance, a statutory provision that implements the Small Business Act by directing that certain contracts be given to small business concerns explicitly states that "[a] contract may not be awarded under this subsection if the award of the contract would result in a cost to the awarding agency which exceeds a fair market price." 15 U.S.C. Sec. 644(a) (Supp. IV 1986) (emphasis added)
 
 
 [3]
 It might be said that this discussion supports the use of a minimum content standard that results in a reasonable increased cost, but not of a case-by-case policy in which a reasonable price premium is paid for items containing recovered materials. This also seems to be the import of the remarks by Representative Wyden. However, the difference between such programs is largely formal. An agency that wished to use a case-by-case approach and pay a price premium could achieve the same result using a minimum content standard. The agency would wait until all bids are in, determine whether an item containing recovered materials was worth buying at the necessary price premium, and, if so, issue a revised specification that contained a standard that allowed it to purchase the desired product
 There is no point to requiring such a Byzantine procedure. Congress included both programs in the statute so agencies could flexibly choose between them. If one method allows a reasonable increased cost, then the other should as well.
 
 
 [4]
 Other agencies have significantly changed course when informed that they had more power than they thought. For example, the NLRB came up with a strikingly different rule regarding the number of bargaining units to be allowed in health-care facilities once freed by this court of the notion that the NLRA required it to adopt a certain standard. See St. Francis Hospital, supra (striking down the NLRB's ruling that the legislative history of the 1974 amendments to the NLRA gave it no choice but to adopt a "disparity of interest" standard that would likely result in no more than three bargaining units in health care facilities); Collective-Bargaining Units in the Health Care Industry, 54 Fed.Reg. 16336 (1989) (to be codified at 29 C.F.R. Sec. 103.30) (subsequently adopted rule allowing up to eight bargaining units in acute care hospitals)
 
 
 [5]
 See, e.g., Paul, For Recyclers, the News Is Looking Bad, Wall St. J., Aug. 31, 1989, at B1, col. 3 (newspaper recycling in danger because politicians have failed to stimulate demand for recycled goods; recycled newsprint has no price advantage against new paper)