## NATIONAL RECYCLING COALITION, INC., Petitioner,

v.

## Carol BROWNER, Administrator, U.S. Environmental Protection Agency, Respondent.

### Nos. 88–1703, 89–1108 and 89–1268.

United States Court of Appeals, District of Columbia Circuit.

Argued Nov. 12, 1992.

Decided Feb. 16, 1993.

Clifford P. Case, III, with whom Jean M. McCarroll and Monica Jahan Bose, New York City, were on the brief, for petitioner.

David J. Kaplan, Atty., Dept. of Justice, Washington, DC, with whom Richard T. Witt, Atty., E.P.A., was on the brief, for respondent. J. Steven Rogers entered an appearance, for respondent.

Before WILLIAMS, SENTELLE, and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

SENTELLE, Circuit Judge:

The National Recycling Coalition ("NRC") petitions for review of Environmental Protection Agency ("EPA" or "Agency") regulations governing procurement by the federal government or for use in federally funded government projects of products containing three types of recovered materials: re-refined oil, retread tires, and building insulation. The NRC maintains that the regulations violate the Resource Conservation and Recovery Act of 1976 ("RCRA" or "the Act"), as amended, 42 U.S.C. § 6901 *et seq.* (1983 & Supp. 1992), on three grounds: first, that the regulations unlawfully exclude from their scope purchases that are "incidental" to federal funding; second, that the EPA Administrator improperly failed to include in the guidelines information regarding price, performance and availability of the recycled materials; and third, that the Administrator improperly failed to include in the

final insulation guideline any minimum recovered materials content standards for fiberglass building insulation. Because we conclude that the regulations survive the standard of review established for statutory construction in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), and the requirements for reasoned decisionmaking set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.* (1988), we deny the petitions for review.

## I. BACKGROUND

### A. *The Resource Conservation and Recovery Act of 1976*

Congress enacted the RCRA in 1976 to address the growing solid waste problem in the United States. To stimulate the market for recycled products, section 6002 of the Act requires that within two years after enactment, each procuring agency purchasing $10,000 or more of an item per fiscal year "shall procure such items composed of the highest percentage of recovered materials practicable, consistent with maintaining a satisfactory level of competition." § 6002(c)(1), 42 U.S.C. § 6962(c)(1). A decision not to procure items with the maximum practicable recovered materials is permitted only when the items are not available within a reasonable period of time, do not meet the applicable performance standards, or are available only at an unreasonable price. 42 U.S.C. § 6962(c)(1)(A)–(C). The Act defines "procuring agency" broadly as "any Federal agency, or any State agency or agency of a political subdivision of a State which is using appropriated Federal funds for such procurement, or any person contracting with any such agency with respect to work performed under such contract." § 1004(17), 42 U.S.C. § 6903(17).

The Act requires the EPA to issue guidelines for the use of procuring agencies in complying with the statute's requirements, stating:

> The Administrator ... shall prepare, and from time to time revise, guidelines for the use of procuring agencies in complying with the requirements of this section. Such guidelines shall ... set forth recommended practices with respect to the procurement of recovered materials and items containing such materials ... and shall provide information as to the availability, relative price, and performance of such materials and items and where appropriate shall recommend the level of recovered material to be contained in the procured product.

*Id.* § 6002(e), 42 U.S.C. § 6962(e).

When the EPA had not issued guidelines by 1980, Congress amended section 6002 to require that regulations be promulgated in various product categories by 1981 and 1982. *Solid Waste Disposal Act Amendments of 1980*, Pub.L. No. 96–482, § 22, 94 Stat. 2347 (1980). When the EPA did not meet these deadlines, Congress again amended section 6002 in 1984, issuing further deadlines for guidelines on paper products and tires. *Hazardous and Solid Waste Amendments of 1984*, Pub.L. No. 98–616, § 501(e), 98 Stat. 3221 (1984) (codified as amended at 42 U.S.C. § 6962 (1988 & Supp.1992)). After the EPA again failed to meet the statutory deadlines, the NRC, among others, sued to compel the EPA to comply with the statute. That lawsuit resulted in a consent decree in which the EPA agreed to publish a final guideline for procurement of re-refined oil by June 24, 1988, for tires by November 10, 1988, and for insulation by February 8, 1989. *Environmental Defense Fund v. Thomas*, No. 87–CV–3212–SS (D.D.C. Apr. 11, 1988).

In the meantime, the EPA had issued a proposed rule and guideline for purchases of recycled paper and paper products in April 1985. 50 Fed.Reg. 14,076 (1985). In June 1988, the EPA issued a final rule, 53 Fed.Reg. 23,546 (1988) (codified at 40 C.F.R. § 250.1 *et seq.* (1992)). The NRC petitioned this Court for review of the paper guideline, challenging the EPA's interpretation of "unreasonable price," creation of an "incidental purchases" exception, and failure to provide information about availability, performance, or relative price. In *National Recycling Coalition, Inc. v. Reilly*, 884 F.2d 1431 (D.C.Cir.1989) ("*Pa-*

*per Guidelines*"), we held that: 1) the EPA's interpretation of "unreasonable price" was consistent with RCRA; 2) petitioners were precluded from challenging the incidental purchases exception because the issue had not been raised during the administrative process; and 3) while the EPA's failure to include price information in the guideline was contrary to RCRA, the EPA could cure the violation by amending the guideline to include a reference to where and how interested parties could secure such data.

### B. The Oil, Tire, and Insulation Guidelines

#### 1. Re-refined Oil

In October 1987, the EPA issued a proposed guideline for the procurement of re-refined oil. *Guideline for Re-refined Oil Content in Oil Procured by the Federal Government (Proposed Rule)*, 52 Fed.Reg. 38,838 (1987). The proposed guideline stated that "[t]his guideline does not apply to purchases which are not the direct result of a contract, grant, loan, funds disbursement, or agreement with a procuring agency." *Id.* at 38,849.

After notice and comment, the EPA issued a final re-refined oil guideline, *Guideline for Federal Procurement of Lubricating Oils Containing Re-refined Oil (Final Rule)*, 53 Fed.Reg. 24,699 (1988) (codified at 40 C.F.R. § 252.1 *et seq.* (1992)). In the preamble to the final oil guideline, the EPA elaborated on its view of the scope of the applicability of the guideline, defining "direct" and "indirect" purchases by covered entities, to which the rule applies, as excluding "incidental" purchases by contractors or grant recipients, to which it does not:

> However, the guideline does not apply to such [lubricating oil] purchases if they are unrelated to or incidental to the Federal funding, i.e., not the direct result of the grant, loan, or funds disbursement. An example of a lubricating oil purchase unrelated or incidental to Federal funding is where a contractor purchases an oil change for equipment under a grant

for construction of a public works project.

*Id.* at 24,705. The final oil guideline provides no specific information on the price and availability of re-refined oil.

#### 2. Retread Tires

The EPA issued the proposed retread tire guideline in May 1988 which, like the re-refined oil guideline, included an incidental purchases exception.

> An example of a tire purchase unrelated or incidental to the Federal funding is where a contractor purchases tires for equipment under a grant for construction of a public works project.

*Guideline for Federal Procurement of Retread Tires (Proposed Rule)*, 53 Fed. Reg. 15,624, 15,627 (1988). After notice and comment, the EPA issued a final regulation which retained the incidental purchases exception, but did not include any examples of incidental purchases. *Guideline for Federal Procurement of Retread Tires (Final Rule)*, 53 Fed.Reg. 46,558 (1988) (codified at 40 C.F.R. § 252.1 *et seq.* (1992)). The preamble to the final tire guideline states:

> Several commenters disagreed with EPA's interpretation [of RCRA to exclude incidental purchases], noting that RCRA section 6002(a) states simply that section 6002 applies to "*any* purchase or acquisition of a procurement item" (emphasis added) when the $10,000 threshold is reached. These commenters raise an issue of general applicability to all the procurement guidelines. The Agency plans further review and consideration of this issue and will publish detailed guidance on this subject within the near term. However, at this time, EPA is retaining the proposed language ... which provided that the guideline did not apply to purchases which were not the direct result of a Federal grant, loan, or funds disbursement.

*Id.* at 46,562. The EPA has not as yet published detailed guidance on the subject.

In addition, the final tire guideline does not include information on price or availability. The EPA explained that publishing such information would not be cost effec-

tive and that the information would be "constantly changing, rendering the information published in the Federal Register obsolete." *Id.* at 46,569. The EPA stated that it therefore intended to use "other, less formal, highly available mechanisms to disseminate and update price, performance, and availability information." *Id.*

### 3. Building Insulation

In August 1988, the EPA issued a proposed guideline for the procurement of building insulation products containing recycled materials. *Guideline for Procurement of Building Insulation Products Containing Recovered Materials (Proposed Rule),* 53 Fed.Reg. 29,166 (1988). This proposed regulation also included an incidental purchases exception, and explained:

> An example of an insulation purchase unrelated or incidental to Federal funding is where funds have been provided for public transit maintenance and a new facility is built in which vehicles are repaired. The contractor constructing the maintenance facility also builds a temporary on-site management structure. Any insulation purchases for the second structure are not subject to the requirements in section 6002 of the guideline, even though some of the grant funds supporting the contract might be used to finance the purchases.

*Id.* at 29,188. The insulation guideline provided no specific information as to price and availability, nor did it include a minimum content standard for fiberglass building insulation.

Commenters objected to the incidental purchases exception and the EPA's failure to provide a minimum content standard for fiberglass insulation or information on price, availability, and performance of building insulation using recovered materials.

The final insulation guideline, issued in February 1989, retains the incidental purchases exception, although without the example. *Guidelines for Federal Procurement of Building Insulation Products Containing Recovered Materials (Final Rule),* 54 Fed.Reg. 7,328 (1989) (codified at 40 C.F.R. § 248.1 *et seq.* (1992)). The preamble to the guideline acknowledges some commenters' concerns about the incidental purchases exception and adopts language similar to that of the final tire guideline in promising further review and later publication of detailed guidance concerning the incidental purchases exception. *Id.* at 7,341. No further guidance has yet been forthcoming. The final insulation guideline contains no information on price and availability, although it does state an intent to establish a telephone hotline and a list of manufacturers of building insulation. *Id.* at 7,353. The final guideline also does not have a minimum content standard for fiberglass building insulation. *Id.* at 7,348.

### C. The Notice of Availability

In *Paper Guidelines,* this Court held that while the EPA was in technical non-compliance with RCRA's provisions concerning making information available on price and availability, the deficiency could be cured by inserting in its guideline a reference to where and how interested parties might secure such data. 884 F.2d at 1438. The EPA provided this additional information in a subsequent *Federal Register* "Notice of Availability." *See* 56 Fed.Reg. 20,548 (1991). In September 1991, the EPA published a similar Notice of Availability for the oil, tire and insulation guidelines. *See* 56 Fed.Reg. 43,702 (1991). The EPA announced in this notice that it would make available to interested parties without charge a list of oil re-refiners and manufacturers of recycled building insulation products and a list of tire retreaders. *Id.* at 43,704. These lists are updated periodically and may be obtained through an EPA hotline. *Id.* The Notice further states that "[p]rocuring agencies should contact the manufacturers to discuss their specific needs and to obtain detailed information on the price and availability of recycled products meeting those needs." *Id.*

### II. PRELIMINARY ISSUES

We consider two preliminary issues before proceeding to the merits.

## A. Standing

 As a threshold matter, petitioners must satisfy the requirements of both constitutional and prudential standing. Constitutional standing in an Article III court requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (internal quotation marks omitted). Also, if the party invoking the court's authority is an organization suing on behalf of its membership, it has to show that (1) its members " 'would otherwise have standing in their own right,' " (2) " 'the interests the organization seeks to protect are germane to its purpose,' " and (3) " 'neither the claim nor the relief requested requires the participation of individual members in the lawsuit.' " *Paper Guidelines,* 884 F.2d at 1434 (quoting *Hazardous Waste Treatment Council v. United States EPA,* 861 F.2d 270, 273 (D.C.Cir. 1988)). In *Paper Guidelines,* this Court concluded that the NRC satisfied this standard for constitutional standing. 884 F.2d at 1433–34. Because petitioner's position here is similar in relevant respects, we likewise conclude that it meets the requirements of constitutional standing.

Whether petitioners satisfy the requirements of prudential standing is a separate question. As we explained in *Hazardous Waste Treatment Council v. United States EPA,* 861 F.2d 277 (D.C.Cir.1988), *cert. denied,* 490 U.S. 1106, 109 S.Ct. 3157, 104 L.Ed.2d 1020 (1989), "[f]or prudential standing, a plaintiff usually must show, in addition [to the elements of constitutional standing], that 'the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." *Id.* at 282 (quoting *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830,

25 L.Ed.2d 184 (1970)). The " 'essential inquiry' " under the zone of interests test is "whether Congress 'intended for [a particular] class [of plaintiffs] to be relied upon to challenge agency disregard of the law.' " *Id.* (quoting *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399, 107 S.Ct. 750, 757, 93 L.Ed.2d 757 (1987)).

We are satisfied that the NRC here meets the requirements of prudential standing as well. RCRA provides for citizen suits "against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary...." 42 U.S.C. § 6972(a)(2) (1988 & Supp.1992). The NRC is within the zone of interests section 6972(a) protects. The NRC's counsel has informed the Court—and the EPA has not disputed—that the NRC has several contracts with the EPA governed by the terms of the challenged guidelines. The NRC also "includes corporations engaged in commercial recycling who would clearly have standing to bring this action in their own right." *Paper Guidelines,* 884 F.2d at 1434. For these reasons, we conclude that the NRC's interests are within the zone of interests protected by the RCRA and that the NRC satisfies both the constitutional and prudential requirements for standing.

## B. Ripeness

 The EPA asserts that the NRC's contention that the Agency has illegally exempted certain purchases by non-federal entities from the guidelines is based in part upon the preambles to the guidelines, which provide examples of when the incidental purchases exception might apply to certain, hypothetical purchases. The EPA argues that these particulars are not ripe for review because "they involve highly fact-based hypothetical situations that, depending upon the circumstances or purpose of any given contract or federal disbursement ... may never arise, or may arise in a significantly different factual context." Respondent's Br. at 36. The EPA cites *Natural Resources Defense Council, Inc. v. United States EPA,* 859 F.2d 156

(D.C.Cir.1988), in which this Court stated, "[t]o the extent ... that industry merely attacks the agency's hints in the preamble as to *when* it may impose such conditions the challenge is completely fact-dependent and therefore unripe." *Id.* at 168 (citation omitted). The EPA urges this Court to defer review until the issues presented arise in some more concrete and final form, particularly since postponing review will have no direct and immediate impact on the NRC unless and until the EPA's recommendations in the preamble are adopted and applied by procuring agencies. Respondent's Br. at 38.

The NRC maintains that its claims are ripe for review. It argues, "[c]learly the preamble language is relevant to this Court's review of the challenged provisions of the guidelines, especially because the guidelines themselves fail to delineate which purchases are within the scope of the guidelines." Petitioner's Reply Br. at 14.

In considering a similar ripeness objection, in *Paper Guidelines*, we applied the test for ripeness articulated in *Abbott Labs. v. Gardner*, 387 U.S. 136, 149, 87 S.Ct. 1507, 1515, 18 L.Ed.2d 681 (1967), *overruled on other grounds, Califano v. Sanders*, 430 U.S. 99, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977). *Abbott* sets forth a two-prong test for ripeness—fitness for judicial review and hardship to the parties of withholding such review. In *Eagle–Picher Indus., Inc. v. United States EPA*, 759 F.2d 905, 918 (D.C.Cir.1985), we held that where the first test of fitness for review is met and Congress has emphatically declared a preference for immediate review, no purpose is served by proceeding to the second prong of the *Abbott* analysis.

In *Paper Guidelines*, we found the *Eagle–Picher* application of the *Abbott* test satisfied. "The guideline represents final agency action; and as it will affect the EPA's own procurement decisions, it is irrelevant that other procuring agencies have not yet adopted them. Furthermore, Congress has 'declared a preference' for prompt judicial review of the EPA guideline...." 884 F.2d at 1434 (quoting *Eagle–Picher Indus., Inc. v. United States*

*EPA*, 759 F.2d 905, 918 (D.C.Cir.1985)). The reasoning in *Paper Guidelines* applies here. The NRC's challenge to the EPA's guidelines is fit for review because they constitute final agency action. The regulations do not have to be adopted by other agencies before they become ripe for review since the EPA is itself a procuring agency and Congress has expressed its preference for prompt judicial review, *see* 42 U.S.C. § 6976(a)(1) (requiring that petitions for review of EPA regulations under this chapter be filed within 90 days of their promulgation). Because the NRC's challenges are fit for review, its challenges to the guidelines are ripe.

We recognize that the hypothetical examples of incidental purchases are helpful in illustrating the EPA's conception of the distinction between purchases that are unrelated or incidental to federal funding and those that are not. However, we review only whether the RCRA permits the EPA to promulgate regulations which include incidental purchases exceptions, not the application of those exceptions to particular fact situations. The EPA is correct that the application of the regulations in practice may raise further adjudicable questions. Respondent's Br. at 38.

### III. Discussion

#### A. The Incidental Purchases Exception

The NRC mounts a two-fold attack on the incidental purchases exception, arguing that it is invalid both under RCRA and the APA. We consider the two arguments in turn.

##### 1. The EPA's Interpretation of RCRA

In assessing the validity of the EPA's interpretation of RCRA, we apply the principles set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–44, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Under the *Chevron* analysis, judicial review of an agency's interpretation of a statute committed to its administration is limited to a two-step inquiry. At the first step, we inquire "whether Congress has directly spoken to the precise question at issue."

*Id.* at 842, 104 S.Ct. at 2781. If we then reach the "unmistakable conclusion that Congress had an intention on the precise question at issue," our inquiry ends there, *Ohio v. United States Dep't of the Interior*, 880 F.2d 432, 441 (D.C.Cir.1989). Courts "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781.

However, if the statute is "silent or ambiguous with respect to the specific issue," we proceed to the second step of the *Chevron* analysis. *Id.* At that step, we "defer to the agency's interpretation of the statute if it is reasonable and consistent with the statute's purpose." *Chemical Mfrs. Ass'n v. United States EPA*, 919 F.2d 158, 162–63 (D.C.Cir.1990). "[W]e are not free to 'impose our own construction on the statute, as would be necessary in the absence of an administrative interpretation.' " *Nuclear Info. Resource Serv. v. Nuclear Regulatory Comm'n*, 969 F.2d 1169, 1173 (D.C.Cir.1992) (quoting *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782) (internal brackets omitted). Applying that test to the EPA's interpretation of section 6002 to permit an incidental purchase exception, we conclude that the Agency's interpretation survives both steps of the *Chevron* analysis.

### a. Chevron Step One

The NRC argues first that Congress has clearly spoken on the question at issue and that the incidental purchases exception is contrary to Congress's clear mandate. Section 6002 of RCRA provides:

> [A] procuring agency shall comply with the requirements set forth in this section and any regulations issued under this section, with respect to *any* purchase or acquisition of a procurement item where the purchase price of the item exceeds $10,000 or where the quantity of such items or of functionally equivalent items purchased or acquired in the course of the preceding fiscal year was $10,000 or more.

42 U.S.C. § 6962(a) (emphasis added). The NRC argues that the text of the Act is clear: There is no limiting language in the statute regarding the purpose for which the funds were appropriated or the goal of the contract. The NRC points out that the statute uses the inclusive term "any" to describe the universe of purchases or acquisitions that fall within the statute's ambit. The NRC further notes that the incidental purchases exception does not appear in the Act.

We, however, agree with the EPA that the statutory language does not clearly preclude the interpretation allowing the incidental purchases exception. Section 6002 incorporates the term "procuring agency," which the Act defines as

> any Federal agency, or any State agency or agency of a political subdivision of a State which is using appropriated Federal funds *for such procurement,* or any person contracting with any such agency *with respect to work performed under such contract.*

42 U.S.C. § 6903(17) (emphasis added). We agree with the EPA that this statutory language permits, if not compels, the conclusion that while every federal agency is a "procuring agency" subject to the guidelines, state and local agencies, and government contractors, are "procuring agencies" within the meaning of the statute only to the extent that they expend "appropriated funds for ... procurement" under the contract or act "with respect to work performed under such contract." *Id.* At the very least, there is sufficient ambiguity in the language of the statute that it cannot be said that Congress has directly spoken to the propriety of an incidental purchases exception to RCRA. Thus we find no merit in the NRC's claim that "the Administrator's interpretation is without authorization and contrary to the clear intent of Congress." Petitioner's Br. at 28.

### b. Chevron Step Two

The NRC argues that even if we find that Congress's intent is not clear, the Administrator's incidental purchases exception is unreasonable in light of the statutory language, the legislative history, and the administrative record. *See NRDC v. EPA*, 822 F.2d 104, 111 (D.C.Cir.1987) (citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at

2781–83 (agency interpretation must be "reasonable in light of the language, legislative history, and policies of the statute")). The NRC maintains that the legislative history of RCRA evidences a congressional purpose inconsistent with the incidental purchases exceptions. The NRC cites a House Report in which the House of Representatives expresses its intent to use "federal purchasing power" to provide a stimulus "which has the potential for motivating other levels of government and private industry to use greater amounts of recovered materials." H.R.Rep. No. 1491, 94th Cong., 2d Sess. 51 (1976), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6289, and a conference report to the 1984 amendments stating that the "influence which the Federal government can exert through its purchasing power to stimulate demand of and use of recovered materials should be exercised more vigorously." H.R.Rep. No. 1133, 98th Cong., 2d Sess. 121 (1984), *reprinted in* 1984 U.S.C.C.A.N. 5576, 5692.

These general statements do not do the work the NRC wishes them to do. Nothing in the legislative history indicates a congressional purpose as to the scope of applicability of these regulations, let alone the permissibility of an incidental purchases exception under the Act. In addition, there is nothing in the reports to suggest that Congress intended no exceptions other than the $10,000 floor.

The EPA argues the incidental purchases exception is permissible under step two *Chevron* analysis. The EPA reminds us that the statutory definition of "procuring agency" makes clear that "a nexus must exist between an item purchased by a contractor or non-federal agency and the contract or other federal funding agreement." Respondent's Br. at 14. We agree. Further, the legislative history, by distinguishing between the direct effects of section 6002, and its indirect effects, supports the EPA's position that its interpretation is consistent with congressional purpose. Relevant portions of the House Report state:

> The Committee believes that the use of *federal purchasing power* to provide *this stimulus* [referring to the establish-

ment of "adequate markets for the ... recovered materials"] represents a constructive use of government power which has *potential for motivating other levels of government and private industry* to use greater amounts of recovered materials....

> ... Federal guidelines, standards and specifications used in connection with Federal grants and other Federal assistance to State and local governments *can be an important stimulus for those governments and for private industry to* adopt a pro-recovered materials policy.

H.R.Rep. No. 1491, 94th Cong., 2d Sess. 51 (1976) (emphasis added), *reprinted in* 1976 U.S.C.C.A.N. 6238, 6289. Thus, the legislative history, for what it is worth, is consistent with the EPA's position that the primary impact of its guidelines on nonfederal entities is through a stimulus, and that the guidelines apply with binding force to state and local governments and private industry only when they purchase items with federal funds directly for use by the federal government or in federally funded contracts.

The EPA's interpretation thus reasonably furthers purposes addressed in the legislative history. While petitioner's interpretation may present a permissible alternative construction of the statute, it is not our task to weigh alternative understandings. As the Supreme Court noted in *Chemical Mfrs. Ass'n v. Natural Resources Defense Council*, 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), in a decision upholding the EPA's interpretation of the Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1988):

> We need not find that [the EPA's] is the only permissible construction that EPA might have adopted but only that EPA's understanding of this very "complex statute" is a sufficiently rational one to preclude a court from substituting its judgment for that of the EPA.

*Id.* at 125, 105 S.Ct. at 1107 (internal citation omitted). As with the Clean Water Act, so with RCRA. We conclude that EPA's interpretation of RCRA is a rational one, and we will not substitute either our judgment or NRC's.

### 2. The Administrative Procedure Act

■ The NRC argues that even if the EPA's interpretation of RCRA to permit an incidental purchases exception survives *Chevron* review, the Administrator's decision to promulgate a rule encompassing the exception is nonetheless invalid under the APA. Petitioner asserts that the Administrator failed to provide a reasoned justification for the exception, thus rendering the exception and all three guidelines "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1988). We disagree.

It is true, as we have frequently stated, that a "rule without a stated reason is necessarily arbitrary and capricious." *Small Refiner Lead Phase–Down Task Force v. EPA*, 705 F.2d 506, 551 (D.C.Cir. 1983). However, this is not a case for application of that rule. The requirement of the APA is that "after consideration of the relevant matter presented [during the comment period], the agency shall incorporate in the rules adopted a concise general statement of their basis and purposes." 5 U.S.C. § 553(c) (1988). The Supreme Court has explained that it will " 'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.' " *Motor Vehicle Mfrs. Ass'n of the United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983) (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974)); *see also Global Van Lines v. ICC*, 714 F.2d 1290, 1298 (5th Cir.1983) (holding that the APA requires "that the legal grounds upon which the agency thought it was proceeding appear somewhere in the administrative record").

EPA's interpretation of RCRA section 6002(a), explained in five different sets of guidelines, meets that standard. For the tire, insulation and oil guidelines, EPA first explained the basis for its legal interpretation in its proposals. For example, the preamble to the proposed insulation guideline, under the heading "Applicability," discusses the definition of "procuring agency" set forth in section 1004(17), 42 U.S.C.

§ 6903(17), as it relates to section 6002 of the Act. *See* 53 Fed.Reg. at 29,177. In the proposal EPA also distinguished between purchases that directly result from a contract with a procuring agency and those that do not, explained that the basis for this distinction is found in sections 1004(17) and 6002, and provided examples to illustrate how its interpretation might apply to specific situations. *See* 53 Fed.Reg. at 29,-177. The proposed tire and oil guidelines provide similar explanations of EPA's interpretation. *See* 53 Fed.Reg. at 15,626–27; 52 Fed.Reg. at 38,842.

In the final guidelines, EPA adopted the interpretation in the proposals and further explained the basis for its decision. For example, in the preamble to the oil guideline EPA again described the statutory sections upon which its interpretation is based and the distinction it drew from those statutory provisions, and provided an additional example to illustrate the interpretation. *See* 53 Fed.Reg. at 24,704–05. In a similar manner, EPA explained in the preamble to the final tire and insulation guidelines that it adopted the approach and bases for its interpretation set forth in the proposals, even though EPA intended to consider the issue further and provide additional guidance in the future. *See* 54 Fed.Reg. at 7,341; 53 Fed.Reg. at 46,562.

These explanations in the preamble and final guidelines satisfy the APA's requirement of a "concise general statement of [the rules'] basis and purposes." 5 U.S.C. § 553(c). This is hardly a case where EPA has failed to explain the legal basis for its actions, nor is judicial review frustrated in this case. In these actions, "the agency's path may reasonably be discerned," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, 103 S.Ct. at 2867 (citations omitted), and the guidelines will therefore be upheld.

### B. Availability, Relative Price, and Performance

■ The NRC argues that the EPA's failure to include information about price, performance and availability in the final guidelines violates section 6002 and the APA. Section 6002(e) requires that the

"guidelines ... shall provide information as to the availability, relative price, and performance" of products containing recovered materials. 42 U.S.C. § 6962(e). Despite this statutory mandate, and comments requesting that such information be provided, the EPA's final guidelines contain no information about price and, in the judgment of the NRC, insufficient information about performance and availability of these materials.

The NRC previously challenged the omission of such information in the *Paper Guidelines* case. There we held that while the EPA "is in technical non-compliance with the statute" because it did not make available information about price and availability, it could "cure that deficiency by inserting in its guideline a reference to where and how interested parties may secure such data." 884 F.2d 1431, 1438 (D.C.Cir.1989). In so ruling, we credited the EPA's claim that the "availability and price of recycled paper and paper products were subject to such sharp and frequent fluctuations that specific information about them 'would not remain accurate long enough ... to be useful in a guideline.'" *Id.* at 1438 (quoting 53 Fed.Reg. at 23,559).

The EPA maintains that price and availability information for the products here at issue is also highly variable. *See* 54 Fed. Reg. at 7353–54; 53 Fed.Reg. at 46,570; 53 Fed.Reg. at 24,712–13. The EPA argues that the oil, tire and insulation guidelines, unlike the guidelines in *Paper Guidelines*, are not in "technical non-compliance" with RCRA because the EPA published a "Notice of Availability" for the three guidelines, *see* 56 Fed.Reg. 43,702–04 (1991), and made available to interested parties lists of manufacturers of the three product categories. The NRC responds that the "Notice of Availability" does not satisfy the statute or this Court's ruling in the *Paper Guidelines* case because the lists the EPA provides do not include data about price, availability or performance, as required by RCRA.

We conclude that the EPA's Notice satisfies the statutory requirements concerning the provision of information about price, performance and availability set forth by this Court in *Paper Guidelines.* The EPA's conclusion that price and availability information for these products is highly variable and depends upon a number of factors that constantly change is neither arbitrary nor capricious. Neither is the EPA's conclusion that such lists, at least in order to be useful, would require constant updating. *See* 53 Fed.Reg. at 46,570. The three guidelines do contain information regarding performance for tires, lubricating oil and insulation. *See* 53 Fed.Reg. at 24,-713 (oil guideline); 53 Fed.Reg. at 46,570 (tire guideline); 54 Fed.Reg. at 7,354 (insulation guideline). Although the EPA does not include in its lists price and availability data, it satisfies its obligation to provide such information by informing interested persons where they may secure price and availability data. *See* 884 F.2d at 1438.

### C. Minimum Recovered Materials Content Standards For Fiberglass Building Materials

The NRC also argues that the Administrator's failure to provide minimum recovered materials content standards for fiberglass building insulation violates RCRA and the APA. Section 6002 of the RCRA states that in the guidelines, the Administrator "where appropriate shall recommend the level of recovered material to be contained in the procured product." 42 U.S.C. § 6962(e).

Despite requests from the NRC and others, the Administrator did not adopt such standards for fiberglass building insulation in the insulation guidelines.[1] In the preamble to the final insulation guideline, the EPA stated that "[w]hile EPA appreciates [the] point of view [of the commenters], the most immediate technical problem, the available supplies of postconsumer glass feedstocks, must still be resolved." 54 Fed.Reg. at 7,348. Instead, the EPA stat-

---

1. The EPA did provide minimum content standards for other types of building insulation.

*See* 53 Fed.Reg. at 29,181.

ed that "use of the case-by-case approach, as recommended in [40 C.F.R.] § 248.21(b), is appropriate for fiberglass insulation and will be the most efficient method to implement the preference for recovered materials." *Id.*

The NRC argues that the EPA has failed to provide an adequate explanation for refusing to provide a content standard for fiberglass insulation, and suggests this failure is irrational and renders the guideline "almost meaningless." Petitioner's Br. at 48. The NRC maintains that the "EPA's proffered explanation for not setting a minimum content standard for fiberglass insulation—that adequate supplies of glass may not be available—is unsupported," noting that "[t]he accumulation of solid waste has only increased since the enactment of RCRA, and a surplus of recovered glass has occurred in many localities." *Id.* at 49.

Insofar as the NRC's argument questions the EPA's implementation of 42 U.S.C. § 6962(e), it fails at the outset. The statutory language directing that the EPA, an executive branch agency, shall "where appropriate ... recommend" minimum recovered materials content standards obviously indicates Congress's intent that the Agency resolve open questions and ambiguities in the statute contemplated by the *Chevron* analysis discussed above. Insofar as the NRC's attack depends upon the APA's requirement for reasoned decisionmaking, the question is not much more difficult. The EPA has adequately explained its decision to not provide a minimum content standard for fiberglass insulation manufactured with recycled material. In its building insulation regulation, the EPA explains that much used glass contains impurities that make it unfit for the fiberglass production process, and concludes that glass waste cannot be obtained in sufficient quantities of consistent color or contaminant levels to obviate the problems associated with its usage. 54 Fed. Reg. at 7,335. The NRC's assertion that quantities of solid waste have increased, while presumably true, is not responsive to the problems of fitness of the available glass stock. We are satisfied that the EPA's determination that adequate supplies of usable recovered materials do not exist to warrant establishing a minimum content standard for fiberglass building insulation is reasonable and supported by the record.

## IV. CONCLUSION

For the reasons stated herein, we uphold the three guidelines against the NRC's challenges. The petitions for review are therefore denied.

*So ordered.*